## Case No. 1,534.

### BLEECKER v. BOND.

[3 Wash. C. C. 529.][1]

Circuit Court, E. D. Pennsylvania.   Oct. Term, 1819.

NEGOTIABLE INSTRUMENTS — MATURITY—ESTOPPEL —WITNESS—DEPOSITION — EVIDENCE —CERTIFICATE OF TREASURY OFFICIALS.

1. Action of covenant, upon an agreement under seal, entered into in 1804, in which the defendant bound himself to pay to the plaintiff two notes of 1,250 dollars each, and an unliquidated demand, when it should be liquidated, forthwith; after the defendant should obtain, or be in a legal capacity to obtain the lawful possession of the Georgia lands conveyed by him to E. G. The declaration averred, that on, and ever since the 1st of May, 1806, the defendant was in the legal capacity to obtain, &c.; and, on this, issue was joined. Until the defendant was in the legal capacity to obtain possession of the lands, the plaintiff's claim was suspended; and, as soon as the capacity existed, the plaintiff's right accrued; although the defendant did not choose to obtain, or endeavour to obtain the possession.

2. The mortgagee of the defendant, as the agent of the defendant, having received from the United States, compensation for the lands conveyed to the defendant, by E. G.; and he having conveyed the land to the United States, they being part of the Yazoo lands, the defendant is estopped thereby, from denying his legal capacity to obtain possession of the lands.

3. The deposition of a witness, living out of the state, and more than one hundred miles from the place where the court is held, cannot be read, unless taken under a commission.

[Approved in Allen v. Blunt, Case No. 217.]

4. The certificate of the register of the treasury department, under his hand, that certain receipts, of which copies are annexed, are on file in his office, with a certificate of the secretary of the treasury, under the seal of that department, that he is the register, is not evidence. It must appear, not only that the officer who gives the certificate, has the custody of the papers, but that he is authorized by law to certify them; and the register is not so authorized—a sworn copy should have been produced.

[Cited in Woodworth v. Hall, Case No. 18,016.]

[5. Cited in Patapsco Ins. Co. v. Southgate, 5 Pet. (30 U. S.) 606, to the point that a deposition cannot be read at the trial unless due

---

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

diligence be first used to obtain the attendance of the witness at the trial or his evidence under commission.]

At law. This was an action of covenant upon articles of agreement, bearing date the 15th of November, 1804, entered into between these parties, whereby the defendant covenanted, amongst other things, to repay to Bleecker the amount of two notes, for 1250 dollars each, and the amount of an unliquidated account, when the same should be liquidated, forthwith, after Bond should obtain, or be in a legal capacity to obtain the lawful possession of about 700,000 acres of land in Georgia, which had been conveyed to Bond by Edward Gould. The declaration avers, that the defendant, on the 1st of May, 1806, before, and ever since, was in a legal capacity to obtain the lawful possession of the above lands; on which this issue was joined. The defendant also plead generally covenants performed.

The plaintiff gave in evidence the act of the Georgia legislature of the 7th January, 1795, the grant by the governor to the Georgia Company; the rescinding law of 1796; and a succession of conveyances, from the Georgia Company, of the land mentioned in the articles of agreement, to the defendant; the conveyance to Edward Gould in April, 1798; and of Gould to Bond in 1802:—also a conveyance from Bond to Walter Simms, in 1803. It was also proved, that, on the 8th of November, 1814, Simms released all right and title in these lands to the United States; and in other respects conformed to the requisitions of the act of congress, passed the 31st of March, 1814 [3 Stat. 116, c. 39], and received the compensation allowed by that law, in certificates of stock.

By an award, made in a suit brought by the defendant against Simms, it appeared, that the deed from the former to the latter, though absolute in form, was intended as a mortgage, to secure the payment of a certain unliquidated claim, the balance of which the arbitrators ascertained, and awarded, that, upon the payment of the same, the certificates of stock, received by Simms from the United States, should be transferred to the defendant. This award was returned to the court on the 20th of January, 1817, and judgment thereon became absolute on the fourth day thereafter. This suit was brought on the 28th of the same month; and in March following, the balance awarded to Simms having been paid, the certificates were transferred to the defendant. It was further proved, by a witness, that some time previous to the 28th January, 1817, the attorney of the plaintiff demanded of the defendant a performance of the agreement on which this action is brought, when he acknowledged that he had received the certificates of stock allowed for the land; that a paper annexed to this agreement, being an order for 500 dollars, drawn by the defendant on Edward Gould, in favour of the plaintiff, dated in 1802,

was the amount of the unliquidated demand referred to; and that his only objection to paying that sum, and the amount of the two notes for 2500 dollars, was a set-off which he had to make against the claim.

The following points of evidence were ruled in this cause: 1. That the deposition of a witness, living out of the district of Pennsylvania, and more than one hundred miles from Philadelphia, cannot be read in evidence, unless it be taken under a commission. Evans v. Hettick [Case No. 4,562]. 2. The certificate of Joseph Nourse, the register of the treasury department, under his hand, that certain receipts, of which copies are annexed, are on file in his office, with a certificate of the secretary of the treasury, under the seal of the department, that Joseph Nourse is register, was offered in evidence, and objected to. The court overruled the evidence, upon the ground, that it is not sufficient, that the officer who gives this certificate, has the custody of the papers, unless it also appeared, that he is authorized by law to certify such papers; which this officer is not. A sworn copy ought to have been produced.

It was contended by the counsel for the defendant, that the plaintiff was not entitled to recover in this action; because he had not proved, that the defendant had, at any time, obtained the possession of the lands conveyed to him by Edward Gould, or that he had been in a legal capacity to obtain the lawful possession of the same. The possession spoken of in the agreement, is a legal possession of the land itself; and consequently, excludes the idea of an equitable equivalent, which, against the will of the defendant, might be forced upon him. That at the time this agreement was made, there existed two impediments to the defendant's obtaining legal possession of these lands. The first, was the title of the United States, derived under the cession of the state of Georgia, subject to the Indian title; and the legal title of Simms, under the deed made to him by the defendant prior to this agreement. Both these impediments were to be removed, before the payment of the stipulated sums to the plaintiff could be demanded. The former never was removed. The act of cession by the state of Georgia stipulates, that the territory so ceded, should be for the use of the United States; and that not more than five millions of acres, should be applied to the satisfaction of claims not acknowledged by that state. To this the United States assented. In 1807, an act of congress was passed [2 Stat. 445], to prevent any person from taking possession of the public lands, whether under the sanction of a title thereto or not, and authorizing the president to use the civil authority, or the military force, to remove all persons who should take such possession. The act of March, 1814 [3 Stat. 116, c. 39], requires all persons having claims to lands under the state of Georgia, and not acknowl-

edged by her, to release the same to the United States, before some day in January, 1815, under the penalty of losing the compensation offered by that law, as well as being rendered incapable of maintaining any action to recover the possession of the lands themselves. The release, therefore, was not voluntary, but was given in compliance with a law, which, by disabling the defendant from obtaining possession of the land, discharged him from all the obligations imposed upon him by this contract, which were dependent upon the happening of that event. The same objection is applicable to the legal title vested in' Simms; and even if the jury could, under this issue, consider the receipt of the certificate of stock, as equivalent to the possession of the thing for which it was granted, this equivalent was not received by the defendant, until after the institution of this suit. But, if the plaintiff is entitled to recover any thing in this action, it was contended that he cannot exceed the amount of the two notes for 2500 dollars; since it is obvious, that the defendant's draft on the plaintiff, for 500 dollars, made prior to the date of this agreement, could not be the unliquidated demand, which, "when it should be liquidated," the defendant promised to pay.

It was answered by the counsel for the plaintiff, that as to the unliquidated demand, the evidence was uncontradicted, that the defendant acknowledged it to be 500 dollars, and this ought to be conclusive with the jury. As to the contingency, upon which, the sum agreed by the articles to be paid to the plaintiff, should become due, it could refer only to the impediments created by the law of Georgia, because that was public and notorious; with which both the parties were acquainted. The private conveyance from Bond to Simms, was known only to themselves; and consequently, could not be within the contemplation of the parties, nor could it be their intention to place the payment of the sums to the plaintiff, upon the mere volition of the defendant to pay off the incumbrance, and regain the possession, or to postpone it as it might suit his own convenience. Besides, this deed not having been communicated to the plaintiff, was a fraud upon the agreement, and is on that account to be disregarded. The impediment created by the law of Georgia, was removed by the decision of the supreme court, in the case of Fletcher v. Peck [6 Cranch (10 U. S.) 87]; and from that time, the defendant had a legal capacity to obtain possession of these lands, of which, if he did not choose to avail himself, it was his own neglect, which should not be turned to the prejudice of the plaintiff. The Indian title was not in the contemplation of the parties; and even if it had been, their title was nothing more than a privilege of hunting, which did not interfere with the legal seisin, which the defendant might have acquired. The acts of congress of 1803 [2 Stat. 229, c. 27], 1807,

and 1814, which are principally relied upon by the defendant's counsel, are unconstitutional, so far as they operated to affect the title of the defendant to these lands, being contrary to the 5th article of the amendment to the constitution of the United States, which declares, that "private property shall not be taken for public use, without just compensation;" and this public use, even where a just compensation is made, can never mean the filling of the public coffers by the sales of private property, seized expressly for that purpose. But, at all events, the right of the plaintiff to bring this suit, commenced at the moment that Simms released to the United States, and thereby deprived the defendant of any legal capacity to obtain possession of the land. That release was voluntary, and it was the act of the defendant's trustee. The rule of law, therefore, which is admitted by the defendant's counsel, applies strictly to this case. The counsel claimed interest from the time when a legal capacity existed in the defendant to obtain the possession of these lands.

[Verdict for plaintiff.]

Ewing, and Condy, for plaintiff.

Binney, and Joseph R. Ingersoll, for defendant.

WASHINGTON, Circuit Justice, charged the jury. This is an action of covenant brought upon certain articles of agreement, entered into between these parties, in the year 1804; whereby the defendant agreed to pay to the plaintiff, two notes for 1,250 dollars each, and an unliquidated demand of the plaintiff, when the same should be liquidated, forthwith, after he, (the defendant,) should obtain, or be in legal capacity to obtain the lawful possession of the Georgia lands, conveyed to him by Edward Gould. The question which arises out of the issue, is, whether the defendant was, at any time previous to the institution of this suit, and when, in a legal capacity to obtain the lawful possession of these lands?

It is to be observed, that the subject of inquiry is, legal capacity to obtain possession, and not the actual obtaining of it. It was not the intention of the plaintiff to leave it in the option of the defendant, to defeat, or to postpone his right to the stipulated sums, by forbearing to exercise the legal capacity he might at any time acquire, to gain the possession. So long as this capacity should be opposed by legal impediments, so long the rights of the plaintiff were suspended. When they should cease to exist, those rights were in full force, notwithstanding other impediments created by the defendant himself, which it was within his own power to remove. A contrary doctrine would have authorized the defendant to take advantage of his own wrong, in fraud of his contract, and to the detriment of the plaintiff. The

impediments known to the parties, and which, no doubt, were within their contemplation, were, 1st, the Indian title; and, 2d, the law of Georgia; the title acquired by the United States, under the cession of that state; and the laws of the United States in relation to these lands. No other impediment has been stated by the defendant's counsel, except that produced by the conveyance to Simms, which will hereafter be noticed.

As to the Indian title, that was removed by the treaty of August, 1814. The other impediments were in full operation, in November, 1814; and have never, to this moment, been removed. These were:

1st. The rescinding law, as it is styled, of the legislature of Georgia, passed in the year 1796, professing to annul the act, under which the grant to the Georgia Company was made; and forbidding the courts of justice, in any action which might be depending before them, to admit the said law or grant to be given in evidence.

2d. The cession made by the state of Georgia, to the United States, in the year 1802 [Bior. & D. Laws], of a large territory of country, including the lands which form the basis of the present controversy. This instrument, after ceding to the United States all the right of Georgia to the jurisdiction and soil of the above territory, stipulates, amongst other things, as a condition, that, after satisfying certain claims previously mentioned, the ceded lands should form a common fund for the United States, and be disposed of for that purpose, and none other; provided that congress may, within twelve months after the assent of Georgia to the boundary established by that agreement shall have been declared, dispose of, or appropriate, not more than five millions of acres of the ceded lands, to satisfy and compensate any claims, other than those before recognized by that agreement, which may be made to any part of the said lands; but that no such cession or compensation should be made, unless in virtue of a law which should be passed within the above period.

3d. The act of congress, passed on the 3d of March, 1803,—3 [Bior. & D. Laws] 546; [2 Stat. 229, c. 27],—"regulating the grants of lands, and providing for the disposal of the lands of the United States, south of the state of Tennessee." The 8th section declares, that the residue of the five millions of acres reserved by the articles of cession, to satisfy the claims not confirmed by that agreement, after satisfying certain enumerated claims, or so much of the proceeds thereof as may be necessary, shall be appropriated for compensating such other claims to the lands of the United States, south of the Tennessee, not recognized in said cession; which are derived from any act of Georgia, which congress may hereafter think fit to provide for. Provided, that

no claim shall be embraced, but such of which the evidence shall be exhibited to the secretary of state, to be recorded, before the 1st day of January following; and that no claim, grant, deed, or other written evidence of claim to such lands, derived under the state of Georgia, and not recognized by the agreement of cession, should ever be admitted as evidence in any court of the United States; unless the same has been exhibited to be recorded, within the time, and in the manner before directed. It is further provided, that nothing contained in this act shall be construed to recognize or affect the claims of any persons to any of the said lands. The 9th section provides for the appointment of commissioners, to receive propositions of compromise and settlement from the companies and persons claiming the said lands; and to report their opinion to congress.

4th. The act of congress, passed on the 3d March, 1807,—4 [Bior. & D. Laws] 118; [2 Stat. 445],—"to prevent settlements being made on lands ceded to the United States, until authorized by law;" which declares, that if any person shall, after the passage of the law, take possession of, or settle upon, any lands ceded to the United States by a foreign nation, or by any state, which lands shall not have been previously sold, ceded, or leased by the United States, or the claim thereto by such person shall not have been previously recognized and confirmed by the United States; said offender shall forfeit all his right to the said land, whatever it may be; and the president is authorized to direct the marshal, and to employ, if necessary, the military force, to dispossess and remove him.

5th. The act of congress, passed the 31st March, 1814,—4 [Bior. & D. Laws] 671; [3 Stat. 116, ch. 39],—"providing for the indemnification of certain claimants of public lands in the Mississippi territory." This act allows, to persons claiming lands in the Mississippi territory, under the act of Georgia, of the 7th of January, 1795, whose claims have been exhibited to be recorded, according to the act of 3d March, 1803, until the first Monday in January, 1815, to deposit in the office of the secretary of state, a legal release of all such claim, to the United States, and a transfer to the United States of their right to any money which had been paid by them, &c., into the treasury of Georgia, as the consideration of the purchase of the said land, &c.; such release and transfer to take effect, on the indemnification of such claimants being made, conformably to the provisions of this act. The 2d section creates a board of commissioners, whose duty it was to decide on the validity of the releases, &c.; and also to decide all controversies arising on adverse claims. The 3d section provides, that, on the report of the commissioners to the president, as to the sufficiency of the releases, &c., the names of the claimants, whose claims they have allowed, and the relative proportions on which they are entitled to indemnity under this act; the president is required to cause to be issued, at the treasury department, certificates of stock to such claimants, not bearing an interest; to be paid out of the first moneys in the treasury, arising from the sales of public lands in the Mississippi territory, after payment of the debt to Georgia, expenses, &c. To the different companies are allotted certain sums; and amongst others, to the Georgia Company the sum of 225,000 dollars. The 9th section declares, that, if any person claiming land under the aforesaid act of Georgia, of the 7th of January, 1795, shall neglect or refuse to compromise such claim, in conformity with the provisions of this act, the United States shall be, and are hereby declared to be, exonerated from all such claim; and the same shall be for ever barred; and no evidence of any such claim shall be admitted to be pleaded, or allowed to be given in evidence, in any court, against any grant derived from the United States. Acceding to the terms held out by this law, Simms, on the 8th November, 1814, released to the United States all his title to the lands claimed under the above act of Georgia, of the 7th of January, 1795, and the grant made in pursuance thereof; and received the compensation allowed by the above act of congress, in certificates of stock.

Upon this statement of the acts of Georgia, and of the United States, it must be admitted, that, unless the defendant is prevented by the release executed by Simms, as just stated, and the acceptance of the compensation allowed by the above act of congress [Act March 31, 1814], from asserting that he has never been in a legal capacity to obtain possession of these lands; the impediments to his obtaining such possession, which existed at the time when this contract was entered into, have never been removed, and that a legal incapacity to obtain such possession still continues.

What, then, is the legal effect of this release? Let it in the outset be observed, that the act of Simms is to be considered as that of the defendant. The deed to him, though absolute in form, was substantially a mortgage for securing the payment of money, and was so decided by the award of arbitrators, and the judgment of a court thereon, rendered in January, 1817. Simms was therefore a trustee for the defendant, who was bound by his acts; more especially as he afterwards affirmed them, by bringing an action to recover the certificates of stock which he received from the United States, as the consideration of his release. This being the case, it must be admitted, that the effect of the release was to pass to the United States all the right and title of the defendant to these lands, and that it created a perpetual bar to any claim which he might thereafter

assert to the possession of them. It was a solemn transfer of his right to these lands, for a certain consideration paid by the United States; and from the moment that this contract was complete, he deprived himself of the legal capacity to obtain possession of them. The rule of law is admitted by the defendant's counsel, that, if one person is bound to pay a sum of money, upon the happening of a particular event, which is prevented by the obligor, it is the same thing as if the event had actually taken place; and the right of the obligee to claim the stipulated sum immediately arises.

But it is contended by the defendant's counsel, that if the law discharges, or incapacitates the obligor from performing the act, or renders the performance unlawful, his obligation is discharged. This rule must also be admitted; and then the questions are —1. Whether, in this case, the defendant was prevented by the acts of congress before noticed, from obtaining possession of the lands mentioned in the agreement?—and if so, then —2. Whether he has not also barred himself by his release, so as to subject him to the operation of the first rule?

By the defendant's counsel, it is insisted, that the act of 1807 rendered it unlawful for the defendant to take possession of these lands; and that the acts of 1803 and 1814, barred the right of the defendant, not only to the lands themselves, but also to the compensation, unless he executed the release by a certain period. The alternative then presented to the defendant was, to receive the compensation offered by congress, upon the condition of executing the release of his right, or to lose both that and the land.

In answer to this argument, it is contended, that those acts are unconstitutional; and consequently, would not have prevented the defendant from obtaining possession of these lands, if he had not shut himself out of the tribunals of justice by his own act.

The court feels the difficulty, as well as the delicacy of this question. It is one which has never been decided in any court of the United States, to our knowledge. It is not whether the subject upon which congress has legislated, was without the sphere of those powers which are conferred upon that body by the constitution; because it is not to be denied, that the power of congress to dispose of the public property, and to enact laws in reference thereto, is unlimited. But, can congress legislate upon the rights of individuals, to property acquired or claimed by the United States, and enact laws of forfeiture, or otherwise to defeat those rights, either absolutely or conditionally, at the mere will and pleasure of that body?—does the power to pass laws, though unrestrained by the constitution, include a power to decide upon private rights, and to dispose of private property, because the title asserted by the individual affects property claimed by the United States? There are certain expressions

of the supreme court, in the case of Fletcher v. Peck, 6 Cranch [(10 U. S.) 87], which seem to be not inapplicable to this subject; they are the following—"The question, whether the act of transferring the property of an individual to the public, be in the nature of the legislative power, is well worthy of reflection." Id. 136. "How far the power of giving the law, may involve every other power, in cases where the constitution is silent, never has been, and perhaps never will be definitely stated. The validity of this rescinding act might well be doubted, were Georgia a single sovereign power." Id. "It may well be doubted, whether the nature of society, and of government, does not prescribe some limits to the legislative power; and if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation." Id. 135.

It is true, that private interests must be subservient to the public necessities. This results from the nature of the social compact. Under every government, be the form what it may, private property may be taken for public use, provided a fair compensation be paid for it; and the 5th article of the amendments to the constitution of the United States has provided, that private property shall not be taken for public use, without just compensation. But who is to decide, as to the quantum of the compensation? If the power is exercised exclusively by the legislature, it is easy to perceive that it may be abused; and that the condition may be only nominally performed. Ought not the compensation, in all cases, to be judged of by indifferent persons, so selected as to afford a fair expectation of their acting impartially? The practice, we believe, is universal, in this country at least, to submit the question of compensation to persons summoned for that purpose, by process in nature of a writ of ad quod damnum. But are there not some limits to the exercise of the power itself, even where a compensation, fairly ascertained, is offered to be made? Can private property be seized, for the sole purpose of filling the public coffers with the product of its sale? These are questions of vast magnitude, which this court would deem it its duty to submit to the decision of the supreme court, if they were necessarily involved in the determination of this cause. We think that they are not; and that this case may be decided upon general principles of law, which may be predicated upon an admission of the validity of the acts of congress which have been referred to. The inquiry, however, into this subject, which has been but partially made, will be found to bear upon another view which is yet to be taken of this case.

But it will first be necessary, to inquire into the nature of the title of the purchasers under the Georgia Company, to the lands granted to it by the state of Georgia. In the case of Fletcher v. Peck [supra], the following

points were resolved—1. That the lands lay within the state of Georgia, and that that state had power to grant them. 2. That the Indian title, until extinguished, was to be respected by courts; but that it was not such as was absolutely repugnant to seisin; in fee, on the part of the state. 3. That the estate granted by Georgia, having passed into the hands of purchasers, for a valuable consideration, without notice; the state was restrained, either by general principles which are common to our free institutions, or by the constitution of the United States, from passing any law to impair the estate vested in the said purchasers.

If this then was the title of those persons, who purchased from the grantees, under the state of Georgia, as against that state, it could not, we conceive, be impaired by the subsequent cession of Georgia to the United States. The derivative title of the latter, could not, upon general principles of law, be other, or better, than that of the former. If this be so, then the purchasers under the Georgia Company, acquired a good and valid title against the United States. Admitting, then, the validity of the acts of congress, for the purpose of getting at the question, how far the release of Simms to the United States, can legally affect this case; all that can be said of them is, that they prevented the defendant from obtaining possession of the land; and barred his claim to the same, either against the United States, or against any grantee under them. Still the claim was admitted, or else it would have been unnecessary to require a release of it, as the consideration of the compensation to be paid by the United States. It cannot be contended, that the defendant was compelled to give the release. He was at perfect liberty to do it or not, as he pleased. He preferred the former; and then, by a voluntary act, he extinguished forever all his right to the land, and incapacitated himself to obtain the possession of it, and, for this renunciation, he received the stipulated consideration. So far as his own interest was concerned, the defendant had unquestionably a right to enter into this contract with the United States. It was perhaps prudent in him to do so. But he had no right, by any act of his, and without the consent of the plaintiff, to compromit his interest, and for ever to close the door against his appeal to the justice of the nation, even if he had no stronger ground to stand upon. As to the defendant, it may be admitted, that he bettered his situation, by acceding to the terms held out by the law. Not so as to the plaintiff, if the argument of the defendant's counsel be correct, that, although he has received an equivalent for the possession of the land, he is discharged from his obligation to pay the plaintiff; because he could not, at the time he received it, and never can obtain, the possession of the land. Independent of the release, the defendant might have appealed to the justice of con-

gress to repeal the laws, so far as they had deprived him of his rights; and, if the arguments which have been urged in the preceding part of this opinion, are not strong enough to impeach the validity of the laws in question, they could scarcely have failed to avail the defendant, in his appeal to the legislature of the United States. However this may be, the plaintiff had a contingent interest, dependent upon the acknowledged right of the defendant to these lands, which the defendant could not defeat by any act of his, without the consent of the plaintiff, and upon such terms as he might be willing to agree to. The manifest injustice of a contrary doctrine will appear, by supposing, (as was very probably the present case,) that the sums agreed to be paid by the defendant, upon his being in a legal capacity to obtain the possession of these lands, were, in reality, the consideration agreed to be paid for the purchase of them from the plaintiff. Could it be endured for a moment, that the defendant should, by a contract with the United States, extinguish his right to the land, and receive from the United States the consideration for such relinquishment; and then say to the plaintiff, that, having lost forever the capacity to obtain possession of the lands, he was not bound to pay to the plaintiff the purchase money, which was made to depend upon his having that capacity? Whatever, then, may have been the operation of the acts of congress, the voluntary release of the defendant by his trustee, in November, 1814, was, as it concerned the plaintiff, the same thing as if, at that moment, he possessed the legal capacity to obtain the possession of these lands.

As to Simms's title, it was clearly not embraced by this agreement; because the conveyance to him was secret; and was not, so far as the evidence informs us, communicated to the plaintiff. To introduce this, therefore, as an impediment in the way of the defendant to the obtaining the possession of the land, would be a manifest fraud upon the contract between these parties. But, even if it had been known to the plaintiff, still, it created no legal incapacity in the defendant, to obtain the possession of the land from Simms, provided the release had not been made to the United States; because, by paying off the incumbrances upon the property, the defendant might, at any time, have recovered the possession; and it could never have been competent to the defendant to urge an incapacity, produced by his own act, and which it was in his power to remove, as a reason against paying the sums stipulated in this agreement. If he could, then the alternative, so cautiously provided in the agreement, would have been altogether without meaning; the legal capacity to obtain possession, and the obtaining of it, would in effect mean the same thing.

The next question is, to what amount is the plaintiff entitled to a verdict? As to the two notes for 2500 dollars, no question has been

made, provided the plaintiff can recover anything. There is more difficulty in respect to the 500 dollars. On the one hand, it is contended, that this is an ascertained sum, and can by no means be brought within the meaning of the expressions in the agreement, an unliquidated demand. On the other, it is insisted, that as no evidence has been given of any unliquidated demand to which the expressions in the agreement could refer, and the testimony of the witness is positive, that the defendant acknowledged this sum to be the amount due; this must be considered to be the unliquidated claim referred to in the agreement. This point is submitted to the jury.

As to interest, it clearly ought not to be calculated beyond the 8th of November, 1814, when the release was executed. And the jury may give interest from that period, or from the period when the defendant recognized, or otherwise approved of the release made by his trustee, which was some time in the year 1816 or 1817.

Verdict for the plaintiff.

[For subsequent proceedings on fieri facias and venditioni exponas, see Cases Nos. 1,535 and 1,536.]